IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____
                                       )

JUAN A. RIVERA,                  )

        Plaintiff,           )

        v.               )

                      )     Civil Action No. 08-CV-6185

ROBERT S. MUELLER, Director of the   )     Judge Pallmeyer
      Federal Bureau of Investigation,   )
      Defendant.          )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

GREGORY G. KATSAS
Assistant Attorney General

PATRICK J. FITZGERALD
United States Attorney
THOMAS P. WALSH
Assistant United States Attorney
Northern District of Illinois

ARTHUR R. GOLDBERG (D.C. Bar 180661)
Assistant Director
ELISABETH LAYTON (D.C. Bar 462227)
Civil Division, Federal Programs Branch
U.S. Department of Justice,
20 Massachusetts Ave., N.W., Rm 7110
Washington, D.C.  20530
Telephone: (202) 514-3183
Fax: (202) 616-8470
Elisabeth.Layton@usdoj.gov

Attorneys for Defendant

<u>INTRODUCTION</u>

Plaintiff, a state criminal defendant, challenges a decision by Defendant Robert Mueller, Director of the Federal Bureau of Investigation ("FBI"), denying his request that the agency conduct a "manual keyboard search" of the National DNA Index System ("NDIS"), a system of law enforcement indices the FBI maintains, to seek a potential match to a DNA profile developed by Plaintiff's forensic expert from evidence obtained from a crime scene. The FBI denied Plaintiff's request because it did not comply with the procedural and quality assurance standards developed by the FBI for conducting these types of searches. Specifically, Plaintiff's request failed to comply with the FBI's requirements that a manual keyboard search can only be conducted when (1) a state authorized CODIS Administrator has certified that the DNA profile to be searched meets all the requirements of the DNA Identification Act, 42 U.S.C. § 14131 *et seq.,* and (2) the profile to be searched was developed by an accredited laboratory which meets or exceeds the Quality Assurance Standards developed pursuant to this Act.

The FBI's denial of Plaintiff's request should be upheld and summary judgment be granted for the FBI because, under the familiar standard of review – that of the Administrative Procedure Act, 5 U.S.C. § 706 – the agency's decision was not contrary to law and was neither arbitrary nor capricious. The NDIS is a law enforcement tool and, as Plaintiff concedes, there is no provision in the DNA Identification Act requiring the FBI to conduct a manual keyboard search upon a request by a private party. Thus, Plaintiff cannot maintain that he has any statutory right to have his search conducted, nor can he compel agency action unlawfully withheld because the agency has not refused to do anything which it is lawfully required to do.

In order to provide for manual keyboard searches of NDIS, the FBI, as the exclusive custodian of NDIS, developed Operational Procedures that are consistent with Congress' intent that the Bureau maintain the highest quality assurance standards for the operation of this system. As demonstrated below, these procedures are faithful to congressional intent and therefore entitled to deference from this Court. Because the decision of the FBI in this instance was in accordance with these procedures, the Bureau's actions cannot be held to be either arbitrary or capricious, an abuse of discretion, or not in accordance with the law. To the extent that Plaintiff challenges the Operational Procedures themselves, the Court should accord deference to the FBI's effort to fill a statutory gap by adopting and implementing a policy for conducting manual keyboard searches.

Alternatively, even if the Court does not accord deference to the FBI's policy, it should still find the policy reasonable upon consideration of the statutory silence, the agency's expertise in this complex and highly technical area, and the importance of this policy to the FBI's administration of the statute.

## FACTUAL AND PROCDEDURAL BACKGROUND[1]

### 1. Plaintiff's Request and the FBI's Decision

Plaintiff, an Illinois state prisoner at the Lake Country Adult Correctional Facility in Waukegan, Illinois, was convicted in 1993 of the August 17, 1992 rape and murder of Holly Staker, an 11-year-old girl. Compl. ¶ 7.[2]  In 1998, Plaintiff was re-tried and convicted at a second trial, and the Illinois Appellate Court affirmed that conviction in 2001.  *Id.*  On August 29, 2006, Plaintiff was granted a new trial based in part on new DNA evidence offered by Plaintiff. *Id.* at 14.

On August 8, 2008, Plaintiff's counsel caused a subpoena *duces tecum* to be served on

_____

[1]  Defendant's Statement Of Material Facts, filed herewith pursuant to Local Rule 56.1(a)(3), is incorporated herein by reference.  The Administrative Record previously filed in this matter provides the entirety of the factual record to be considered by the Court. In all but exceptional situations, the APA confines judicial review of agency action to the administrative record, *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998); *viz.*, the "materials compiled by the agency . . . that were before the agency at the time the decision was made." *James Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996).  "The fact finding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking." *Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985).  Instead, a reviewing court's task is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision "based on the record the agency presents to the reviewing court."  *Id.* at 743-44 (citing *Overton Park, supra*); *accord PBGC v. LTV, Corp.*, 496 U.S. 633 (1990) and *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Thus, "courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made," and "should have before [them] no more nor less information than did the agency when it made its decision." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623-24 (D.C. Cir. 1997).  The Declaration of Douglas R. Hares, NDIS Custodian  ("Hares Decl.") is submitted herewith for the purpose of explaining certain materials in the Administrative Record and not for the purpose of providing any additional or different rationale for the FBI's denial of Plaintiff's request.

[2]  For purposes of this Motion, the FBI accepts the factual allegations in the Complaint regarding the identity of the Plaintiff and the proceedings in his criminal case.

Robert D. Grant, Special Agent-in-Charge of the FBI, Chicago Division, requesting that he appear before Judge Christopher Starck of Lake County, Illinois Circuit Court and bring with him "[a]ll information in [his] possession contained in FBI CODIS and other data bases, which match the DNA profile described in attached scientific report." A.R. 41.[3] Accompanying this subpoena were a number of attachments, including reports by Dr. Edward T. Blake, of Forensic Science Associates regarding "PCR Based DNA Analysis of Spermatozoa from the Holly Staker Vaginal Samples." A.R. 66-116.[4] The DNA profile that plaintiff requested the FBI to search against NDIS was created by a private laboratory that not only is not accredited by an independent accrediting body, but is run by a forensic scientist, Dr. Blake, who refuses to apply for accreditation. Compl. ¶ 24(c).

The FBI responded to this subpoena by letter dated August 28, 2008, in which the Director of the FBI Laboratory declined to search for DNA profiles as Plaintiff had requested. A.R. 1-2. The letter stated that the FBI would not honor Plaintiff's request, explaining as follows:

> Under procedures established by the National DNA Index System (NDIS) Board, requests for searches of profiles that are not maintained in the database, also known as keyboard searches, must be submitted through the appropriate Combined DNA Index System (CODIS) State Administrator. However, even if a request such as yours was forwarded by a CODIS administrator, the FBI would still be unable to honor it. The DNA Identification Act, which established NDIS, requires that the index only include information on DNA analyses that are prepared by laboratories that are accredited and which undergo external audits that demonstrate compliance with the quality assurance standards established by the Director of the Federal Bureau of Investigation. The profile which you are requesting the FBI to search was developed by a laboratory which does not submit to external audits designed to assess compliance with these mandated quality assurance standards. Furthermore, to the best of our knowledge, the laboratory in question is not currently accredited by any accrediting agency.

---

[3] References to the "Record" or "A.R." refer to the certified Administrative Record.

[4] The Record shows that this was not the first attempt by plaintiff's counsel to request these records from the FBI. Rather, the record contains a docket entry from this Court dated January 11, 2006 granting a motion by Plaintiff for leave to issue and serve a subpoena, A.R. 123, and a subpoena *duces tecum* requesting that Special Agent-In-Charge Robert D. Grant produce the same documents later requested in the August 2008 subpoena.

A.R. 1-2.  The letter went on to say: "If any sample remains for testing, we would advise that you ensure it is analyzed by an accredited laboratory which follows the quality assurance standards.  It may then be possible for a CODIS State Administrator to take ownership of the profile and upload it into NDIS for searching."  *Id.*[5]

**2.      The Instant Lawsuit**

On October 28, 2008, two months after the FBI denied Plaintiff's request that the FBI run a Manual Keyboard Search against the DNA profile developed by Dr. Blake, Plaintiff filed the instant Complaint For Injunctive Relief, in which he seeks judicial review of the FBI's August 28, 2008 decison pursuant to the APA, 5 U.S.C. § 701 *et seq.*, and asks the Court to "[o]rder Defendant to promptly perform the keyboard search of the DNA profile obtained by Dr. Blake and provided by Plaintiff in the subpoena against NDIS."  Compl. at 12.[6]

## STATUTORY AND POLICY FRAMEWORK

**1.      The DNA Identification Act**

The statutory framework governing NDIS is found at 42 U.S.C. §§ 14131 through 14136. Congress first granted the FBI the authority to establish NDIS for law enforcement purposes in the DNA Identification Act of 1994, Pub. L. No. 103-322 (1994) (the "Act"), which was part of the Violent Crime Control and Law Enforcement Act of 1994.  *See* 42 U.S.C. § 14132(a).  The Act further required the Director of the FBI to establish a DNA Advisory Board to develop and recommend standards for quality assurance, and strictly defined the allowable types and quality of DNA identification records which may be "includ[ed] in NDIS.  *See* 42 U.S.C. § 14132(b). Following several subsequent amendments to the Act, today NDIS comprises indices containing DNA identification records of convicted persons, indicted persons, and persons whose DNA is voluntarily submitted for elimination purposes, as well as analyses of DNA samples recovered

---

[5]  Because Plaintiff has not made any subsequent request to the FBI to search a DNA profile from an accredited lab, it appears that Plaintiff has not followed this recommendation.

[6]  Notwithstanding the fact that Plaintiff first requested that the FBI conduct the requested search in early 2006, based upon Plaintiff's impending trial date on February 9, 2009, the Court has granted Plaintiff's requests to set abbreviated schedules for the FBI to respond to the Complaint, file the Administrative Record, and submit the instant Memorandum.

from crime scenes, from unidentified human remains, and voluntarily contributed by relatives of missing persons. 42 U.S.C. § 14132(a).

Only §§ 14131 and 14132 of the Act are relevant to this case. Section 14132 authorizes the Director of the FBI to "establish" NDIS. 42 U.S.C. § 14132(a). It also strictly defines the allowable types and quality of DNA identification records which may be "includ[ed]," in the system. 42 U.S.C. § 14132(b). Specifically, that subsection provides that the index [NDIS], "shall include only information on DNA identification records and DNA analysis that are--

> (1) based on analyses performed by or on behalf of a criminal justice agency . . . in accordance with publicly available standards that satisfy or exceed the guidelines for a quality assurance program for DNA analysis, issued by the Director of the [FBI] under section 14131 of this title;
>
> (2) prepared by laboratories that--
>> (A) not later than 2 years after October 30, 2004, have been accredited by a nonprofit professional association of persons actively involved in forensic science that is nationally recognized within the forensic science community; and
>>
>> (B) undergo external audits, not less than once every 2 years, that demonstrate compliance with standards established by the Director of the [FBI]; and
>
> (3) maintained by Federal, State, and local criminal justice agencies ... pursuant to rules that allow disclosure of stored DNA samples and DNA analyses only--
>
> [disclosure provisions omitted]

. . . .

42 U.S.C. § 14132(b).

## 2.    Statutory Quality Assurance Requirement

Section 14131 of the Act requires the Director of the FBI to issue, "standards for quality assurance, including standards for testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA," based upon the recommendations of an advisory board appointed for this purpose." 42 U.S.C. § 14131(a). The purpose of this section is to ensure the highest level of integrity and reliability of the NDIS system.

Pursuant to this mandate, the Director of the FBI adopted Quality Assurance Standards for

Forensic DNA Testing Laboratories (hereinafter "Quality Assurance Standards"), based upon the recommendations of the DNA Advisory Board. These standards took effect on October 1, 1998.[7] *See* A.R. 11-29. The standards are "to ensure the quality and integrity of the data and competency" of a DNA testing laboratory. A.R. 12. They set out extensive and detailed requirements concerning: internal quality assurance systems, appropriate staffing and personnel, proper facilities, internal evidence control systems, use of validated methods and procedures, use of approved written analytical procedures, equipment calibration and maintenance, generation of reports properly based upon case notes, internal administrative and technical review of all case files and reports, proficiency testing of examiners and other technical personnel, corrective action, internal and external audits, safety, and required certification of compliance by any subcontractor. *See* A.R. 16 - 29.

Compliance with these standards is to be documented not only through internal and external audits, but also through accreditation. The Preface to the standards clearly states:

> An underlying premise for [the Board's deliberations] was that accreditation would be required to demonstrate compliance with the standards and therefore assure quality control and a quality program. Accordingly the Board recommends that forensic laboratories performing DNA analysis seek such accreditation with all deliberate speed. Additionally, the Board strongly encourages the accrediting bodies to begin positioning themselves to accommodate the increasing demand for accreditation.

A.R. 11.

**3. Statutory Accreditation Requirement**

Any laboratory participating in NDIS is required to be accredited. 42 U.S.C. § 14132. The FBI, however, is not statutorily required to promulgate standards for accreditation. To the contrary, the FBI Laboratory itself must apply for accreditation in the same manner as any other laboratory. Nor does the FBI Laboratory or NDIS have any control over the process of laboratory accreditation, which, in the United States, may be sought through one of two private accreditation bodies: The American Society of Crime Laboratory Directors/Laboratory Accreditation Board

---

[7] The standards were recently revised; however, the new version does not take effect until July 1, 2009.

(ASCLD/LAB)-International or Forensic Quality Services-International.  There are now approximately 180 participating accredited laboratories across the United States; all 50 States now participate in NDIS. Each of the private accrediting bodies has a search function and list of accredited laboratories on its website.[8]  When it is necessary for the FBI's CODIS Unit to determine whether or not a laboratory is accredited, *i.e.*, when the CODIS Unit is not already familiar with a laboratory, CODIS Unit personnel consult these sources.  Hares Decl. at ¶ 20.

**4.  NDIS Policies And Procedures**

a.  <u>General Operation of NDIS</u>

The law enforcement system of indices that Plaintiff requested the FBI search, NDIS, is an "index to facilitate law enforcement exchange of DNA identification information," established by the Director of the FBI (the "Director") pursuant to authority delegated to him by the DNA Identification Act,  42 U.S.C. § 14132.  NDIS was created for the purpose of enabling federal, state, and local law enforcement laboratories to help generate law enforcement leads by identifying potential matches between crime scene DNA and DNA profiles of offenders gathered nationwide and uploaded to NDIS through the Combined DNA Index System (CODIS).  Hares Decl. ¶¶ 6-9.

CODIS is a software system developed for the FBI to facilitate the operation of NDIS – specifically, to  enable federal, state, and local laboratories to enter and compare DNA profiles electronically within NDIS.  Hares Decl. ¶ 7.  CODIS operates over three hierarchical levels, NDIS being the highest level, the State DNA Indexing System (SDIS) being the mid-level, and the Local DNA Indexing System (LDIS) being the lowest level.  *Id.*  Data flows upward within the system: each participating state and local laboratory maintains and uploads DNA profiles into its own separate DNA index system*.  Id.*  Those profiles then flow upward from the local to the state, and from the state to the federal level using the CODIS software.  *Id.*  The CODIS software enables participating agencies to compare DNA profiles on a national level, in order to fulfill law enforcement missions such as determining whether a convicted offender may be linked to a crime or identifying missing or unidentified persons.  *Id.*  Only federal, state, and local criminal justice agencies may access CODIS.  *Id.*

----

[8]         *S e e*    http://www.ascldlab.org/iso/aslabinternlabsearch.html; http://www.forquality.org/fqs_I_Labs.htm.

Oversight and responsibility for administration of the CODIS program lies within the mission of the CODIS Unit which is part of the FBI Laboratory Division, Scientific Analysis Section, Forensic Analysis Branch. Hares Decl. ¶ 8. Among other duties, the CODIS Unit is charged with ensuring that CODIS and NDIS Operations comply with all applicable laws and procedures. *Id.*[9]

The general function of NDIS is to generate leads for the law enforcement community. Hares Decl.¶ 9. The primary way CODIS software performs this function is by automatically running a search of all data contained in NDIS on a weekly basis, in order to identify potential matches among and between forensic unknown data newly-entered into the system from crime scenes, and offender data already contained in the system. *Id.*

As required by the DNA Identification Act, in order to ensure the quality and accuracy of the data contained in NDIS, all forensic labs that participate in NDIS must, first, meet or exceed certain Quality Assurance Standards developed and recommended to the FBI Director by a DNA Advisory Board, pursuant to 42 U.S.C. § 14131; and, second, be accredited by one of two private, independent accrediting bodies in the United States. *Id.* ¶¶ 18-21. Only DNA profiles developed by accredited labs and uploaded through appropriate participating federal, state, and local law enforcement agencies are searched in the course of these routine weekly searches performed by CODIS. *Id.* ¶ 7.

b. Manual Keyboard Searches

Beginning in January 2003, the FBI recognized the occasional need to perform exceptional, expeditious searches of NDIS outside of the routinely scheduled weekly searches. These searches, which are performed manually at the request of the NDIS Custodian, are known as "Manual Keyboard Searches." Hares Decl. ¶ 16. These Manual Keyboard Searches are

---

[9] Fulfillment of these missions by CODIS has been the subject of two audits by the Department of Justice Office of Inspector General ("OIG"), in 2001 and 2006. *See* DOJ, OIG Audit Report No. 01-26, The Combined DNA Index System (Sept. 2001), http://www.usdoj.gov/oig/reports/FBI/a0126/final.pdf; DOJ, OIG Audit Report No. 06-32, Combined DNA Index System Operational and Laboratory Vulnerabilities (May 2006) http://www.usdoj.gov/oig/reports/FBI/a0632/final.pdf. Ensuring rigorous quality assurance and compliance with procedural safeguards – the very policy concerns which underlie this case – was one of the main concerns expressed by the OIG in conducting these audits.

performed in two instances of compelling law enforcement necessity, either (1) where there is an urgent need to search the DNA profile of a violent criminal who, it is believed, may commit another crime before the routine automatic search is conducted; or (2) where a DNA profile from a crime scene is not sufficiently detailed to qualify for being uploaded to the NDIS system but the NDIS Custodian, at his discretion, determines that it is appropriate to search manually for potential matches to the incomplete profile. *See id.*

In order to provide guidance to the federal, state, and local laboratory employees who serve as CODIS administrators, an NDIS Procedures Board (consisting of representatives of the state, federal, and local law enforcement agencies that are authorized to participate in CODIS) created NDIS Manual Keyboard Searches by NDIS Custodian, Operational Procedures ("Operational Procedures"). *Id.* ¶¶ 16 - 17; A.R. 30-40. These Operational Procedures specify that a Manual Keyboard Search can be run only when (1) a CODIS State Administrator has certified that the DNA profile to be searched meets all the requirements of the DNA Identification Act; and (2) the profile to be searched was developed by an accredited lab which meets or exceeds the Quality Assurance Standards developed pursuant to 42 U.S.C. § 14131. *Id.* ¶ 14.

Through this certification process, the state agency making the request takes ownership of any DNA data submitted to NDIS with a request for a Manual Keyboard Search. This critical ownership process ensures the quality of the data being submitted to NDIS. *See* Hares Decl. ¶ 20. The certification process also allows a state agency to take ownership of and submit to NDIS for a Manual Keyboard Search a DNA profile which was developed by a private laboratory with which the state, or one of its local governments, has contracted. *See id.* at ¶ 20; Checklist, 1(A)("DNA profile(s) generated by or on behalf of a criminal justice agency"), A.R. 38-39.

The Operational Procedures and accompanying Checklist also contemplate acceptance of a DNA profile not generated by or on behalf of a criminal justice agency, *i.e.*, by a private laboratory, where the DNA profile is accompanied by a federal court order requiring the search of the profile. Hares Decl. ¶ 17. While the Operational Procedures refer to a "court order," Operational Procedures, 4.4., the allowance is intended only for a federal court order. *Id.*; A.R. 38. Moreover, the Operational Procedures contemplate that any federal court order will concern DNA data which complies with the Act's quality control requirements. Hares Decl. ¶ 17.

9

When a Manual Keyboard Search is run in NDIS, any potential match found by the search does not immediately yield the identity of the individual whose DNA profile was found to be a match. Indeed, NDIS does not contain names, case-related information, or other personally-identifying information about the persons from whom DNA samples are collected. Hares Decl. ¶ 30(a). *See* 61 Fed. Reg. 37495 (July 18, 2006) ("FBI Privacy Act Systems"). Only operational identifiers such as Specimen Numbers, Criminal Justice Agency Identifiers, and DNA Personnel identifiers are contained with the corresponding DNA data in NDIS. *Id.* NDIS does not release such identifiers to any party other than the holder of the identifiers, *i.e.*, the agency which submitted the profile for inclusion in NDIS. *Id.*

Further, NDIS searches only return potential candidate matches. Hares Decl. ¶ 30(b). NDIS' role in the event of a potential match is to notify both submitting agencies of the potential match; it is then the responsibility of the agencies to go through confirmation procedures to determine whether there is a match in fact. *Id.* Each state has its own confirmation procedures. Thus, in the event that the DNA data which was the subject of plaintiff's request were searched against NDIS and a potential match identified, the result would be in the form of operational identifiers for the potential match, and NDIS would notify the originating agency. *Id.*, ¶ 30(c). Whether the state could or would honor that request would be a matter of individual state law, and a matter over which the FBI Laboratory would have no control. *Id.*, ¶ 30(c).

## ARGUMENT

## I.    The FBI Did Not Unlawfully Withhold Or Unreasonably Delay Agency Action.

Plaintiff's claim that the FBI's denial of his request for a keyboard search constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1) must be reviewed under the standard set forth in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), which holds that a court may only compel agency action that is both discrete and legally required. *Id.* at 62-64. The Court explained that "[t]he limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 65; *accord Beam v. Gonzales*, 548 F. Supp. 2d 596, 613 (N.D. Ill. 2008) (holding that there can be no judicial review of agency inaction where there is "no

discrete, non-discretionary action to compel"). [10]

Plaintiff has not, and cannot, establish that the FBI is "demanded by law" to run the Manual Keyboard Search in NDIS as he has requested; therefore there is no basis for the court to compel the agency to take such action pursuant to § 706(1). Under a heading contending that "the requested comparison is authorized by the applicable statute," plaintiff offers only the irrelevant allegation that "[s]ection 14131 does not preclude the keyboard DNA search requested by Plaintiff. . . ." Compl. ¶ 24. Plaintiff's attempt to draw the inference that the DNA Identification Act *compels* the FBI to run the requested search merely because the statute itself does not *prohibit* such a search is unavailing. Instead, as discussed above, the statute is silent on the subject of manual keyboard searches; therefore, under 5 U.S.C § 706(1), the FBI may not be compelled to run such a search.

## II. The FBI's Action Was Not Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With The Law.

### A. The Director's Interpretation Of The DNA Identification Act Is Entitled To *Chevron* Deference.

Review of agency action under the APA is "highly deferential." *Israel v. U.S. Dept. of Agriculture*, 282 F.3d 521, 526 (7th Cir. 2002); *see also Ambach v. Bell*, 686 F.2d 974, 981 (D.C. Cir. 1982) (APA review is "highly deferential . . . [and] presumes the agency's action to be valid." (citations omitted)). In determining whether the FBI's decision not to conduct the search of NDIS requested by plaintiff is "arbitrary, capricious, an abuse of discretion, and not in accordance

---

[10] The Complaint appears to allege violations of other provisions of 5 U.S.C. § 706, including 5 U.S.C. § 706(2)(A), alleging the FBI's actions were "contrary to constitutional right, power, privilege, or immunity," and that "[p]laintiff's constitutional rights to due process of law and equal protection of law will be violated if the keyboard search is not performed," Compl. ¶¶ 25, 26; 5 U.S.C. § 706(2)(B), alleging the FBI's actions were "without observance of procedure required by law," Compl. ¶25; and 5 U.S.C. § 706 (2)(D), alleging the FBI's actions were "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court," Compl. ¶ 25. However there are no factual allegations in the Complaint, much less in the administrative record, that support these bare assertions. Because the challenged FBI action complied with the law and the agency's own policies, and plaintiff has not identified any purported constitutional violation, there is no basis upon which to grant plaintiff relief under any of these provisions. *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 228 n. 6 (2001) *Marsh*, 490 U.S. at 376.

with law," 5 U.S.C. § 706(2)(A), a court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Although the arbitrary and capricious standard "may appear to grant courts broad power to review agency action, such is not the case." *Hudson Transit Lines v. ICC*, 765 F.2d 329, 336 (2d Cir. 1985). Rather, under the arbitrary and capricious standard, the scope of judicial review is narrow. *Id.* The court's task is limited to determining whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983). To do this, the court must determine whether the action that the plaintiff challenges "'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. V. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285 (1974)):

> An agency decision may be considered arbitrary and capricious only if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's, Inc. v. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Further, a court must accord special deference where, as here, the Director has adopted policies implementing a statute that Congress authorized him to implement. *See ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994); *Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981). Deference to an agency is particularly warranted when the challenged agency policy concerns "a complex and highly technical" program in which consideration of "criteria necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Review of the Director's interpretation of the DNA Identification Act is governed by the familiar two-prong test established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984). The first question under *Chevron* is "whether Congress has

12

directly spoken to the precise question at issue." *Id*. at 842. If, after the Court "exhaust[s] the traditional tools of statutory construction," *Natural Resources Defense Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843 n. 9), the intent of Congress is clear, "that is the end of the matter." *Chevron*, 467 U.S. at 842. If, however, the statute "is silent or ambiguous with respect to the specific issue," the court must proceed to the second prong of *Chevron*, under which "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. This is particularly true when a court's decision on the reach of a statute involves "reconciling conflicting policies, and a full understanding of the force of the statutory policy . . . has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id*. In such cases, as long as the agency's construction "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id*. at 845 (citing *United States v. Shimer*, 367 U.S. 374 (1961)). Because, in this case, the DNA Identification Act is silent with respect to the requirements that must be met in order for the FBI to conduct a Manual Keyboard Search – a highly technical area requiring more than ordinary knowledge – the second prong of *Chevron* should be applied here to the FBI's effort to fill this statutory gap in the adoption and implementation of its Operational Procedures, which provide the requirements for the FBI to perform such a search.

The FBI's Operational Procedures at issue here were not promulgated through notice-and-comment rulemaking, the category of agency interpretations most clearly entitled to "full *Chevron* deference." *White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2005) (citing *United States v. Mead*, 533 U.S. 218, 227-28 (2001). Instead, the agency interpretation of a statutory gap that is challenged here may be deemed to fall into the category of "less formal pronouncements like interpretive rules and informal adjudications [which] may or may not be entitled to *Chevron* deference." *Krzalic v. Republic Title Co.*, 314 F.3d 875, 879 (7th Cir. 2002) (quoting Richard J. Pierce, Jr., *Administrative Law Treatise* 3.5, at 6-7 (4th ed. Supp. 2003); *accord White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2005). Nevertheless, the Supreme Court has made clear that an agency's interpretation of a statutory gap may be entitled to *Chevron* deference even when it is not

13

made through a method as formal as notice-and-comment rulemaking. In upholding a Social Security Administration interpretation of a statutory definition, the Court explained as follows:

> [T]he fact that the Agency previously reached its interpretation through means less formal than "notice and comment" rulemaking, *see* 5 U.S.C. 553, does not automatically deprive that interpretation of the judicial deference otherwise its due. . . . If this Court's opinion in *Christensen v. Harris Country*, 529 U.S. 576 (2000), . . . suggested an absolute rule to the contrary, our later opinion in *United States v. Mead Corp.*, 533 U.S. 218 (2001), . . . denied the suggestion. *Id.* at 230-31. . . ("[T]he want of notice and comment "does not decide the case"). Indeed, *Mead* pointed to instances in which the Court has applied *Chevron* deference to agency interpretations that did not emerge out of notice-and-comment rulemaking. . . . . It indicated that whether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue.

*Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).

Even if the agency is not entitled to *Chevron* deference in this situation, however, the degree of deference first described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and, more recently, in *Barnhart v. Walton*, would nevertheless apply. Under *Skidmore*, "[t]he more technical the issue is, the less guidance the statute provides to its correct resolution, the more sensible-seeming the agency's decision, and the more deliberative and empirical the procedures employed in arriving at that decision, the greater the deference that a reviewing court will give it. *Krzalic v. Republic Title Co.*, 314 F.3d 875, 878-79 (7th Cir. 2002). As the Seventh Circuit has explained in *Krzalic*:

> *Barnhart v. Walton*, . . . , the Supreme Court's most recent decision interpreting *Chevron*, suggests a merger between *Chevron* deference and *Skidmore*'s . . . approach of varying the deference that agency decisions receive in accordance with the circumstances: "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of the administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue."

*Krzalic*, 314 F.3d at 878-79 (quoting *Barnhart*, 535 U.S. at 222).[11] Here, in carrying out its

---

[11] *But see Sehie v. Aurora*, 432 F.3d 749, 753 (7th Cir. 2005), in which the Seventh Circuit held that it was not bound by Department of Labor opinions and quoted *Christensen v. Harris Cty*,

statutory duties to administer NDIS, the FBI has had to deal with important and complex legal and scientific issues requiring a high degree of expertise. The Operational Procedures are the result of the FBI's careful consideration of these issues. At a minimum, these Procedures should be accorded *Skidmore*/*Barnhart* deference. In any event, regardless of which degree of deference is applied to the FBI's decision here, the silence of the statute as to requirements for having a Manual Keyboard Search conducted, the technical nature of the issue, and the agency's expertise are all important factors weighing in favor of upholding the FBI's decision against a challenge under 5 U.S.C. § 706(2)(A).

**B.** **The FBI's Denial Of Plaintiff's Request For A Manual Keyboard Search Was Not Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With The Law, But Instead Was Based Upon Agency Policies Authorized By The DNA Identification Act And Which Constitute A Permissible Construction Of That Act.**

**1.** **The FBI's Decision Was Based On Its Operational Procedures**

The FBI denied Plaintiff's request for a Manual Keyboard Search because it was not submitted through a CODIS State Administrator and because the DNA profile Plaintiff asked to search was not developed by an accredited laboratory which meets or exceeds the Quality Assurance Standards. Therefore, the request failed to comply with the Operational Procedures' requirements. *See* Hares Decl. ¶ 14; Operational Procedures, 4.0, 4.1 (A.R. at 32) and Appendix B: Checklist for Searching DNA Profiles at NDIS ("Checklist") (A.R.. 38-39). It was neither arbitrary

---

529 U.S. 576, 587 (2000), for the proposition that "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." 432 F. 3d at 753. This case is distinguishable from the instant case for three reasons. First, the court noted that the Department of Labor opinion letters relied upon by the plaintiff in that case did not definitively state the agency's policy because there were other opinion letters that supported the contrary position. *Id.* Second, because no agency manuals were considered in that case, any reference to agency manuals is nothing more than *dicta*. Third, the court in *Sehie* relied upon *Christensen* for the apparent proposition that an agency interpretation reached through less formal means than notice-and-comment rulemaking is automatically deprived of *Chevron* deference, without acknowledging the later limitations on *Christensen* articulated in *Mead*, 533 U.S. at 230-31 and *Barnhart*, 533 U.S. at 221-22.

nor capricious for the FBI to follow its own established procedures in making this decision. [12]

It may be that Plaintiff found the wording of the FBI's denial letter less than clear, since the letter notes that the DNA Identification Act "requires that the index only ***include***" DNA profiles from accredited laboratories, A.R. at 1 (emphasis added), and Plaintiff points out that his requested search "will not ***add*** the DNA profile obtained by Dr. Blake, or ***include*** that profile, in the CODIS system." Compl. ¶ 24(a) (emphasis in original). However, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.' " *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citing *Bowman*, 419 U.S. at 286 (finding that orders, read in conjunction with explanatory correspondence, adequately grounded agency action)). Here, a reviewing court may reasonably discern the agency's path by reviewing the FBI's Operational Procedures, which apply the same accreditation requirement and Quality Assurance Standards to DNA profiles used for Manual Keyboard Searches that the DNA Identification Act applies to DNA profiles that are uploaded into NDIS.

The FBI applied these requirements for a Manual Keyboard Search to Plaintiff's request consistently with the manner in which it applies these requirements in all cases. *See* Hares Decl. ¶¶ 24-30 (explaining express requirements set forth in Operational Procedures, Checklist, and Official Facsimile Form, A.R. at 30-40.) Nor was not arbitrary and capricious for the FBI to reject Plaintiff's efforts to substitute other purported assurances of the quality of the DNA profile developed by Dr. Blake for the uniform requirements adopted by the FBI in its Operational Procedures. For example, Plaintiff offers as alleged proof of the accuracy of the DNA profile developed by Dr. Blake the stipulation of the Illinois state prosecutor that the Illinois state crime lab developed a "low level," "corroborating" genetic profile, Compl. ¶ 24(d), and further states that the profile "has been verified as accurate by the Wisconsin forensic laboratory." *Id*. ¶ 24(d). These

---

[12] Although plaintiff attempts to create an issue out of the fact that these procedures were not publicly available or provided to him, *see* Compl. ¶ 19, there is no legal relevance to that allegation. It was neither arbitrary nor capricious that the FBI's internal procedures, intended to be used only by those law enforcement personnel authorized to participate in NDIS, were made available only to such law enforcement personnel. *See* Hares Decl. ¶ 12.

purported forms of "proof" are not sufficient because there has been no "ownership" of the profile by a state CODIS Administrator; nor has it been established that the laboratory that developed the profile was accredited and met or exceeded the Quality Assurance Standards. *See* Hares Decl. ¶¶ 18 - 23; A.R. 11-29. Rather than acting arbitrarily or capriciously in deeming Plaintiff not to have met the requirements necessary to obtain a Manual Keyboard Search, the FBI applied its permissible requirements in a consistent and uniform manner. *See, e.g.*, Hares Decl. ¶ 25.

**2.      The FBI's Operational Procedures Are Entitled To Deference Because They Fill A Statutory Gap**

The DNA Identification Act is not ambiguous, but is silent with respect to the requirements for conducting a Manual Keyboard Search; thus, there is a gap in the statute. The *Chevron* Court explained that, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (citing *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). Furthermore, the Court noted that the interpretation of the agency which is entrusted to administer a statutory scheme should be afforded considerable weight. *Id*. at 844. This is particularly true when a court's decision on the reach of a statute requires "reconciling conflicting policies" and where " full understanding of the force of the statutory policy . . . has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* In such cases, as long as the agency's construction "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845 (citing *United States v. Shimer*, 367 U.S. 374 (1961)).

Here, the FBI was asked to weigh the rationale behind plaintiff's request – *e.g.*, the desire of a criminal defendant to use NDIS to search for a potential match to a crime scene DNA profile of indeterminate quality – against policies that the FBI believes are embodied in the DNA Identification Act. As a matter of policy, the FBI and the NDIS Procedures Board take the view that the importance of maintaining compliance with the Quality Assurance and accreditation requirements mandated by the DNA Identification Act for DNA data cannot be overstated, because it is adherence to the quality and privacy protections imposed by federal law that the FBI attributes

17

the success of NDIS as a law enforcement tool.  *See* Hares Decl. ¶ 22.  The FBI is keenly aware that one of Congress' goals in enacting the DNA Identification Act was to ensure that "both government *and private* laboratories doing DNA analysis for forensic use should  meet designated quality standards and be subject to periodic inspections."  H.R. REP. NO. 103-45, at 7 (emphasis added) (citation omitted).  Nothing in 42 U.S.C. § 14131, which mandates that the Director appoint an advisory board to develop DNA quality assurance methods, restricts the application of these standards to laboratories contributing DNA profiles that are actually uploaded into NDIS.  *See* A.R. 3-4.  Thus, in weighing competing policy considerations here, the FBI gave great importance to its own role as guardian not just of the quality of  DNA profiles entered into NDIS but also as guardian of the quality assurance standards maintained more broadly among forensic laboratories and forensic analysts.  As to NDIS itself, the FBI has a substantial policy interest not only in maintaining the scientific integrity of the database, but also in maintaining NDIS' reputation for providing reliable outcomes from the searches it conducts – reliability which can only be maintained through use of the many safeguards the FBI's Operational Procedures have constructed.

Simply put, the FBI's decision was informed by a concern about what might happen if Manual Keyboard Searches were run against profiles of unknown or dubious quality.  Because there is an elevated risk that a  profile from an unaccredited lab would have errors in it, running such a search would risk incorrectly identifying an innocent person as potential match.  *See* Hares Decl. ¶ 28.  If, as a policy matter, the FBI had  decided to run Manual Keyboard Searches like the search requested by Plaintiff, the agency  would be running searches with a heightened risk of false positives or false negatives, which might lead to reputational harm to NDIS and therefore erode its success with the courts as a law enforcement tool.[13]  The FBI is not required by the Act or any other law to make such a policy choice.  Thus, the Court should treat with deference the FBI's policy choice in favor of  maintaining the integrity and reputation of NDIS over the competing policy

---

[13]  In addition, if the FBI were required to perform Manual Keyboard Searches at the request of private individuals and counsel, this might present to the agency an overwhelming burden, contrary to one of Congress' purposes in enacting the DNA Identification Act, which was to eliminate a crisis of DNA backlogs, which created "significant delays in the administration of justice." HR Rep. No. 108-711 (2004); 2005 U.S.C.C.A.N. 2274, 2277.

implicitly contained in Plaintiff's request.

The Supreme Court addressed another agency's efforts to fill a statutory gap in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). In *Brand X*, the Court held that under *Chevron*, a court must defer to the agency's construction, ***"even if the agency's reading differs from what the court believes is the best statutory interpretation***," if the statute is within the agency's jurisdiction to administer and where the agency's construction of an ambiguity is reasonable. *Brand X*, 545 U.S. at 980 (citing *Chevron*, 467 U.S. at 843-44 (upholding agency's interpretation of the term "telecommunications service" by the Federal Communications Commission [FCC]))(emphasis added)). In *Brand X*, the Ninth Circuit had ruled against the agency interpretation, based upon a prior court decision. The Supreme Court rejected this approach, concluding:

> The better rule is to hold judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.

*Id.* at 983. *See also Lopez v. Davis*, 531 U.S. 230, 242 (2001) ("where Congress has enacted a law that does not answer 'the precise question at issue,' all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap 'in a way that is reasonable in light of the legislature's revealed design.'") (internal citation omitted).

Furthermore, the deference accorded to the agency's administrative construction must be substantial where, as here, the subject matter "is technical and complex.*" Aluminum Co. of America v. Central Lincoln People's Util. Dist.*, 467 U.S. 380, 389 (1984). This is because, in such complex and technical matters, the agency has the necessary technical expertise to make the best decision about how to implement the statute. Congress has entrusted the Director of the FBI with the tasks of establishing NDIS, and issuing Quality Assurance Standards for NDIS after considering recommendations of a DNA Advisory Board appointed by the Director, see 42 U.S.C. § 14131(a), because of the FBI's technical and law enforcement expertise regarding use of DNA analysis as a law enforcement tool. So, too, should the FBI be entrusted to determine under what circumstances NDIS can be used for a Manual Keyboard Search, a procedure not addressed by the

19

statute, in a manner that best preserves the effectiveness of NDIS as a law enforcement tool. *See* Hares Decl.¶¶ 22-23. Given the scientific and technical nature of the DNA profiles and related information at issue here, as well as the complexity of maintaining the value of NDIS as a law enforcement tool, *see* Hares Decl. ¶¶ 22-23, the FBI's implementation of the DNA Identification Act should be given considerable deference.[14] In upholding a declaratory ruling by the Federal Communications Commission ("FCC"), the Seventh Circuit explained as follows:

> Wisely, we believe, we have noted that specialized agencies are "more qualified than generalist courts to handle technical matters within their purview. They are the experts. Court second-guessing of administrative decisions typically 'do[es] not make [for] better technical decisions than those of agencies.' " *United Transp. Union-Illinois Legislative Bd.*, 169 F.3d 474, 476 (7th Cir. 1999), citing *United States v. Baxter Healthcare Corp.*, 901 F.3d 1401 (7th Cir. 1990).

*City of Chicago v. FCC*, 100 F.3d 424, 428 (7th Cir. 1999).[15]

**3.    Even If The FBI's Operational Procedures Are Not Entitled To Chevron Step Two Deference, They Are Still A Permissible Construction Of The Statute.**

---

[14]  Indeed, prior to 2006, Section 14132 of the Act included an express provision allowing authorized users to conduct a one-time keyboard search of NDIS of a DNA profile not suitable for uploading into the NDIS system. That provision, the now-repealed Section 14132(e), provided that "[t]he ***Director shall ensure that any person who is authorized to access the index . . . for purposes of including information on DNA identification records or DNA analysis*** may also access that index for purposes of carrying out a one-time keyboard search." 42 U.S.C. § 14132 (Amendments) (emphasis added) (noting that this former subsection. (e) was repealed by Pub. L. 109-162 § 1002(4), Title X, Jan. 5, 200 6, 119 Stat. 3085 ). Although the "one-time keyboard search" formerly addressed in the Act was of a different type than the Manual Keyboard Searches for which the Operational Procedures were written, *see* Hares Decl. ¶¶10-17, it is telling that Congress both entrusted to the Director the task of controlling access to NDIS for the purposes of a keyboard search and intended that access to be limited to those otherwise authorized to access the index. Where, as here, Congress has recognized the special expertise of an agency in handling technical matters, it is appropriate for courts to do the same.

[15]  The Court also noted that in 1999 "the deference to be given to informal expressions of an agency's view [was] unresolved, but that some deference, at least, [was] to be paid even to views set forth in amicus curiae briefs filed by an agency." *City of Chicago*, 199 F. 3d at 429. Since that time, the Supreme Court has made clear in *Mead* and *Barnhart* that agency manuals and other articulations of agency interpretations of a statutory gap less formal than notice-and-comment rulemaking are not automatically deprived of *Chevron* deference. *Barnhart*, 535 U.S. at 221-22; *Mead*, 533 U.S. at 230-31; *accord Krzalic*, 314 F.3d at 879.

Applying the *Barnhart* analysis, *see* 535 U.S. 212, and *Krzalic*, 314 F.3d 875, even if the Court were to determine that *Chevron* step two deference does not apply here, several factors weigh in favor of according some consideration, more favorable to the FBI than that outlined in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the FBI's specialized expertise and authority in adopting its Operational Procedures. These factors include: the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, and the complexity of the administration. *Barnhart, 535 U.S.* at 222; *Krzalic*, 314 F. 3d at 879.

First, the legal question of under what circumstances the FBI will conduct a Manual Keyboard Search is interstitial because the Act is silent on the subject. Plaintiff's allegation that "the requested keyboard search falls within the statutory requirements cited in the FBI's letter. . . , and will accomplish a lawful criminal justice purpose within the meaning of Section 14131," Compl. ¶ 24(f), lacks support in the record. It is the law enforcement agencies that participate in NDIS that make the determination of whether a compelling law enforcement purpose necessitates a Manual Keyboard Search outside of the routine weekly searches performed by NDIS. *See* Hares Decl. 16-17. Indeed, the obvious point that Congress created NDIS as a law enforcement tool is reflected in the headings of the subchapter of the statute where the DNA Identification Act is codified. Subchapter IX of Title 42, Chapter 136 of the U.S. Code is entitled "State and Local Law Enforcement." *See* A.R. 3, 6. Because NDIS was never intended to be used by the general public, the Operational Procedures setting forth the procedures for Manual Keyboard Searches were written for the CODIS Administrators who are responsible for the administration and security of the CODIS software for each laboratory that participates in NDIS, and are made available to all national, state, and local law enforcement participants in the CODIS system through a secure law enforcement network maintained by the FBI. Hares Decl. ¶ 12. [16]

Indeed, the unique ability of the FBI to determine what safeguards are necessary to protect

---

[16] It is notable that, if Congress had disapproved of the FBI's filling of the statutory gap regarding Manual Keyboard Searches, it could have addressed the subject itself in its most recent amendments to the Act but has not done so. The Operational Procedures were created by the NDIS Board in January 2003 and revised in January 2006 while § 13132 was most recently amended in 2006. *See* A.R. 30; 2006 Acts. House Report No. 109-233; 2005 U.S.C.C.A.N. at 1636.

21

the accuracy of Manual Keyboard Searches of NDIS and the continued effectiveness of NDIS as a law enforcement tool is highlighted by examining how plaintiff's allegations in support of the relief he seeks are entirely unrelated to the FBI's reasoning in adopting and implementing the Operational Procedures. For example, Plaintiff alleges that because the search he has requested "is a routine process that is not costly or time consuming, the FBI should have run his search." Compl. ¶ 17. In fact, the cost or time burden of a keyboard search has never been a factor in the FBI's denial of Plaintiff's request. *See* A.R. 1-2.[17] Instead, the reason for FBI's denial is grounded on the FBI's concern that the exceptional procedure known as a Manual Keyboard Search be run only in limited circumstances in which there is not only a necessity for running a search outside of the routine weekly searches within NDIS but also state CODIS administrators are satisfied that the profile being searched satisfies the requirements of the DNA Identification Act. *See* Hares Decl. ¶¶24-27. In the FBI's judgment, a DNA profile that is developed by an unaccredited lab such as Dr. Blake's, in which the FBI has no assurance that Quality Assurance Standards are met, raises concerns that the profile may have many errors including, but not limited to, contamination from another sample that could result in an incorrect identification by CODIS of a potentially matching profile. Hares Decl. ¶ 28. Alternatively, searching NDIS against an

---

[17] While the FBI concedes that conducting the search requested by Plaintiff would not be time consuming, it would like to clarify for the Court that, even if the Court were to grant the relief sought by Plaintiff, the result of an NDIS search would not necessarily or immediately be the one Plaintiff predicts. Plaintiff asserts that "[t]he DNA profile keyboard search that Plaintiff seeks this court to order the FBI to conduct may provide evidence crucial to Plaintiff's defense in his forthcoming trial, and information as to the person who raped and killed Holly Staker." Compl. ¶ 5. In fact, even if the NDIS custodian were to run the search plaintiff has requested and the search found a potential match, any Manual Keyboard Search of the submitted DNA profile would fail to achieve this result because: (1) NDIS does not contain names or other personally-identifying information about the persons from whom DNA samples are collected, but would instead release only "operational identifiers" (such as Specimen Numbers and Criminal Justice Agency Identifiers), and in any event would only release those to the agency which originally submitted the DNA profile for inclusion in NDIS. Hares Decl. ¶ 30(a). Similarly, NDIS searches return only potential match candidates, after which time it is the responsibility of the relevant agencies to go through confirmation procedures to determine whether there is in fact a match. *Id.* ¶ 30(c). Each of these examples helps illustrate that neither the Act nor FBI procedures adopted pursuant to the Act contemplate that a Manual Keyboard Search should be run other than at the request of a CODIS Administrator, who has verified that the appropriate quality assurance standards have been met.

inaccurate profile could result in a failure to identify a potential match to a perpetrator. *Id.* The FBI is concerned not only about NDIS being used to potentially misidentify a profile contained in NDIS as matching the profile Dr. Blake derived from the Holly Staker crime scene, but also about the broader policy concern that courts continue to accept the accuracy of NDIS. *See id.* ¶ 22.

The "importance of the question to administration of the statute," *Barnhart*, 535 U.S. at 222, is another factor weighing in favor of the FBI's decision. In 42 U.S.C. § 14132, Congress mandated that the Director of the FBI appoint an advisory board of members of the scientific community to promulgate Quality Assurance Standards. Adherence to the resulting Quality Assurance Standards and to ensuring the quality of laboratories performing DNA analysis through accreditation are integral to the DNA Act. Section 14131, which authorizes the FBI to set Quality Assurance Standards, is not limited in application to § 14132, which authorizes the creation of NDIS; nothing in § 14131 states that the quality assurance standards are only to be applied to those laboratories submitting data for inclusion in NDIS under § 14132. Rather, the section broadly reads that, "[t]he standards . . . shall specify criteria for quality assurance and proficiency tests to be applied to the various types of DNA analysis used by forensic laboratories." 42 U.S.C. § 14131(a)(3). It is entirely consistent with this congressional scheme for the Director of the FBI to have adopted the Operational Procedures and all of their quality safeguards, as recommended by the NDIS Procedures Board.

Adherence to the requirements of the Act, with its emphasis on quality standards, is one of the primary reasons that NDIS has operated successfully for a decade, from 1998 to 2008. *Id.* Furthermore, adherence to statutory and systemic safeguards of NDIS has been noted with approval by the judiciary in upholding constitutional challenges to various amendments to the DNA Identification Act. Hares *Decl. ¶ 22; see, e.g.*, *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004); *United States v. Amerson,* 483 F.3d 73 (2nd Cir. 2007). Thus, while there have been pressures from various sources to reduce the minimum quality requirements in order to permit quicker or more voluminous analyses, the FBI Laboratory, as guardian of NDIS, has consistently and successfully resisted such pressures in order to closely enforce Congress's mandate and maintain the integrity of NDIS. *Id.* The FBI's administration of the Act involves the agency in safeguarding both the accuracy of NDIS and its effectiveness as a law enforcement tool, which

means that the FBI's policy determination that running a Manual Keyboard Search against a profile of questionable accuracy would be contrary to the purpose of the Act is reasonable and should be accepted, even if the Court itself might have reached a different decision.  *See Marsh*, 490 U.S. at 416 (court may not substitute its judgment for that of the agency).

Plaintiff's contentions that "[t]here is no competing interest at stake that argues against the compelling need for [the requested Manual Keyboard Search]" and that "[l]aw enforcement will not be impaired by the requested keyboard search," Compl. ¶ 33, are incorrect.  Only the FBI is in the proper position to identify and weigh the competing policy interests.  In this case the FBI appropriately declined to make an exception to its established policy, which reasonably established criteria for conducting Manual Keyboard Searches that serve the policy goals of the Act.

The final criteria articulated in *Barnhart*, the "careful consideration the Agency has given the question over a long period of time" is less readily applicable here, where the FBI has never previously considered a formal request that it conduct a Manual Keyboard Search based upon a profile developed by an unaccredited lab and a request that did not come from a CODIS administrator.  However, the FBI has given careful consideration to the criteria governing the conduct of a Manual Keyboard Search since at least 2003, and amended its Operational Procedures as it deemed appropriate in 2006.  Accordingly, for six years the FBI has given careful consideration to the appropriate procedures for a Manual Keyboard Search and this factor also weighs in favor of upholding the FBI's decision.

Thus, based on all the factors articulated by the Supreme Court in  *Barnhart* and acknowledged by the Seventh Circuit in *Krzalic*, the FBI's decision here cannot be deemed to be arbitrary, capricious, or otherwise not in accordance with the law.

24

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that summary judgment be granted in its favor.

Dated: January 12, 2009     Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

PATRICK J. FITZGERALD
United States Attorney

THOMAS P. WALSH
Assistant United States Attorney
Chief, Civil Division
219 Dearborn Street
Chicago, Illinois
(312) 353-5300

  */s Elisabeth Layton*
ARTHUR R. GOLDBERG (D.C. Bar 180661)
Assistant Director
ELISABETH LAYTON (D.C. Bar 462227)
Civil Division, Federal Programs Branch
U.S. Department of Justice,
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Telephone: (202) 514-3183
Fax: (202) 616-8470
Elisabeth.Layton@usdoj.gov

Attorneys for Defendant

25

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, in accordance with Fed. R. Civ. P. 5, LR 5.5, and this Court's General Order on Electronic Case Filing, the foregoing Memorandum In Support Of Defendant's Motion For Summary Judgment, was served pursuant to the district court's ECF system as to ECF filers.

/s  *Elisabeth Layton*
Elisabeth Layton
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Avenue, NW
Washington, DC 20044
(202) 514-3183