IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JUAN A. RIVERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 08-CV-6185 |
| ROBERT S. MUELLER, Director of the | ) | Judge Pallmeyer |
| Federal Bureau of Investigation, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DOUGLAS R. HARES

Douglas R. Hares, pursuant to 28 U.S.C. § 1746, declares the following:

(1) I am currently the Custodian of the National DNA Index System ("NDIS"), in the CODIS

(Combined DNA Index System) Unit at the Federal Bureau of Investigation (FBI) Laboratory in

Quantico, Virginia. I have held this position since June 2006. I am currently also the Acting Unit Chief

of the CODIS Unit. Prior to my selection as NDIS Custodian, I served as a forensic examiner in the

DNA Analysis Unit II of the FBI Laboratory for approximately six (6) years.

(2) In my current capacity as the NDIS Custodian, I oversee the daily operations of NDIS,

and it is my responsibility to ensure the quality and integrity of NDIS. The statements contained in this

declaration are based upon my personal knowledge, upon information provided to me in my official

capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) This civil action challenges the decision by the Director of the FBI Laboratory to decline

the request by counsel for plaintiff Juan A. Rivera to run a "Manual Keyboard Search" against NDIS of

a DNA profile developed by Dr. Edward Blake of Forensic Science Associates, a private laboratory.

I am familiar with the request and the Laboratory's decision in this case.

(4) Due to the nature of my official duties, I am also familiar with the federal law which governs NDIS – the federal DNA Identification Act, 42 U.S.C. §§ 14131, *et seq.*,-- and all NDIS procedures, including those which govern requests for Manual Keyboard Searches submitted to the FBI Laboratory.

(5) Based upon my knowledge of and familiarity with the issues before this Court, I previously certified the Administrative Record [hereinafter "Record"] in this case to be true and complete, and I am familiar with all of the information and materials contained therein. The purpose of this Declaration is to explain the procedure known as a Manual Keyboard Search; the document entitled "National DNA Index System (NDIS) NDIS Manual Keyboard Searches by NDIS Custodian, Operational Procedures," [hereinafter "Operational Procedures"], Record at 30 - 37; the FBI's denial of plaintiff's request for a Manual Keyboard Search, Record at 1 - 2, and related materials in the Record.

**General Overview of NDIS**

(6) Pursuant to the authority of 42 U.S.C. § 14132, the Director of the FBI established NDIS for law enforcement purposes.

(7) CODIS is a software system developed for the FBI to facilitate the operation of NDIS -- specifically, to enable federal, state, and local laboratories that participate in NDIS to upload and compare DNA profiles electronically within NDIS. CODIS operates over three hierarchical levels, NDIS being the highest level, the State DNA Indexing System (SDIS) being the mid-level, and the Local DNA Indexing System (LDIS) being the lowest level. Data flows upward within the system: each participating state and local laboratory maintains and enters DNA profiles into its own separate

-2-

DNA index system. Those profiles are then uploaded from the local to the state and from the state to the national level using the CODIS software. The CODIS software enables participating agencies to compare DNA profiles on a national level, in order to fulfill law enforcement missions such as determining whether an offender may be linked to a crime or identifying missing or unidentified persons. In accordance with federal law, only federal, state, and local criminal justice agencies may access CODIS. *See* 42 U.S.C. § 14132(b)(1) - (b)(3)(NDIS shall include only data developed by or on behalf of a criminal justice agency).

(8) Oversight and responsibility for administration of the CODIS program lies within the mission of the CODIS Unit which is part of the FBI Laboratory Division, Scientific Analysis Section, Forensic Analysis Branch. Among other duties, the CODIS Unit is charged with ensuring that CODIS and NDIS operations comply with all applicable laws and procedures.

(9) The purpose of NDIS is to generate leads for the law enforcement community. The CODIS software performs this function by automatically running a search of all data contained in NDIS on a weekly basis, in order to identify potential matches between forensic unknowns (profiles obtained from biological samples found at crime scenes that can be attributed to putative perpetrators), and offenders already contained in the system.

### Manual Keyboard Search

(10) A Manual Keyboard Search is one that is performed as its name implies – manually, entered by or at the direction of the NDIS Custodian, as opposed to one run by the routine weekly search performed by the CODIS software.

(11) The NDIS Procedures Board consists of representatives of the federal, state, and local

-3-

law enforcement agencies who are authorized to participate in NDIS pursuant to 42 U.S.C. § 14132.

The functions of the NDIS Procedures Board include the creation and revision of operational

procedures, such as those discussed in this Declaration, which establish uniform procedures for NDIS

usage to be followed by all participating law enforcement agencies.

(12) The DNA Identification Act does not expressly provide for Manual Keyboard Searches.

Consequently, the Operational Procedures described in this Declaration were written by the NDIS

Procedures Board. These are the "procedures established by the National DNA Index System

(NDIS) Board" referred to in the FBI's letter denying plaintiff's request, Record at 1. As is stated in

Section 1.0 of the document, the purpose of the Operational Procedures is "to define the parameters

for Manual Keyboard Searches by the NDIS Custodian. Th[e] document is written for CODIS

Administrators." Record at 31. A CODIS Administrator is an employee of the NDIS participating

laboratory who is responsible for the administration and security of CODIS at that site. As such, the

document assumes a basic level of knowledge possessed by CODIS administrators who have received

training on the CODIS software and the DNA data eligible for NDIS. The Operational Procedures

and other referenced documents which control NDIS' handling of Manual Keyboard Search requests

were not written to provide guidance or information to the general public or otherwise intended to be

publicly disseminated. Therefore, these documents are not made publicly available but, instead, are

available to NDIS, SDIS, and LDIS participators in the CODIS system, where they reside on a secure

law enforcement network maintained by the FBI.

(13) The Operational Procedures were written for CODIS Administrators, because only

participating SDIS law enforcement agencies can approve requests for Manual Keyboard Searches to

-4-

NDIS. NDIS does not accept requests for Manual Keyboard Searches submitted directly from LDIS agencies or any other entities, including private laboratories without State CODIS Administrator approval. *See* Operational Procedures, 4.0, Record at 31. If an LDIS agency desires a Manual Keyboard Search to be conducted, it must submit the request to NDIS through its CODIS State Administrator. *See* Operational Procedures, 4.1, Record at 32. The CODIS State Administrator is the central point of contact between the state and the NDIS Custodian. As such, the CODIS State Administrator is responsible for ensuring that all participating laboratories within that state comply with the terms and conditions for participation in NDIS.

(14) Any DNA data submitted to NDIS for a Manual Keyboard Search must be certified by the appropriate CODIS State Administrator as having met all requirements of the DNA Identification Act. *See* Operational Procedures, 4.0 and Figure 1, Record at 31, 34; Appendix B: Checklist For Searching DNA Profiles At NDIS [hereinafter "Checklist"], Record at 38 - 39; DNA Search Requests By Facsimile Official Form, Record at 40. These requirements include, certification that the DNA data has been submitted by an accredited laboratory which meets or exceeds the Quality Assurance Standards. *Id.* All of the requirements which are specifically listed on the Checklist and the Official Facsimile Form must be met in order for a request for a Manual Keyboard Search to be accepted by the NDIS Custodian.

(15) This certification process also allows an NDIS participating agency to take ownership of and submit to NDIS for a Manual Keyboard Search, or if appropriate, uploading to NDIS, a DNA profile which was developed by an accredited, Quality Assurance Standards compliant private laboratory. This may occur when the state, or one of its local governments, has contracted with the

-5-

private laboratory, or even where no contractual relationship exists. See Checklist, 1(A), Record at 38

("DNA profile(s) generated by or on behalf of a criminal justice agency"). I am personally aware of

situations where data developed by an accredited, Quality Assurance Standards compliant, private

laboratory has been reviewed by an NDIS participating laboratory, which then took ownership of that

profile and uploaded it into NDIS, even though there was no contractual relationship between the

private laboratory and the NDIS participating laboratory.

(16) The Operational Procedures were initially developed in January 2003 by the NDIS

Procedures Board in response to a perceived need of the NDIS participating law enforcement agencies

to have a process for requesting searches of NDIS when the following two types of compelling law

enforcement necessity warranted an expeditious search outside of the normal search. At the time of the

initial development of the procedures, the routine search was conducted on a monthly basis. The

routine search is currently conducted on a weekly basis.

(a) The first category of DNA profiles for which the Manual Keyboard Search was developed

is that in which urgency requires that a search that would normally be performed as part of the routine

weekly search described in Paragraph 9, above, be performed immediately. This need may arise when

law enforcement has developed a DNA profile of a violent criminal and believes there is a possibility

that the offender may commit another crime before the routine automatic search is conducted. Under

such circumstances, the Manual Keyboard Search procedure allows a search of a DNA profile for a

potential match in NDIS to be performed without waiting for the scheduled automatic search, provided

the submitted DNA profile meets all other requirements, as discussed in Paragraph 14, above. Under

such circumstances, the DNA profile being searched will eventually be entered into NDIS in the regular

-6-

course and, from that time onward, included in the routine automated search.

(b) The second category of DNA profiles for which the Manual Keyboard Search was developed is that in which forensic necessity compels a waiver of the NDIS procedural requirement for a minimum number of loci for the submission of DNA profiles to NDIS. Loci (the plural of "locus") are specific locations on chromosomes. CODIS has designated thirteen (13) specific locations as the CODIS core loci, which serve as markers for identification purposes. Among many other requirements for inclusion of DNA data in NDIS is the general rule that a forensic unknown profile must have at least ten (10) core CODIS loci, with thirteen (13) loci being the optimum number of loci for such purposes. However, if a law enforcement agency is only able to obtain a DNA profile with seven (7) to nine (9) of the core CODIS loci, at my discretion, a Manual Keyboard Search may be conducted of the profile, provided it complies with all other requirements, including that it has been submitted to the NDIS Custodian by a CODIS State Administrator and generated by an accredited laboratory which meets or exceeds the Quality Assurance Standards. *See* Operational Procedures, 4.5. Under such circumstances, the DNA profile being searched will not be entered into NDIS.

(17) The Operational Procedures and accompanying Checklist also contemplate acceptance of a DNA profile not generated by or on behalf of a criminal justice agency, *i.e.*, by a private laboratory, where the DNA profile is otherwise accompanied by a federal Court Order requiring the search of the profile. While the Operational Procedures refer to a "court order," Operational Procedures, 4.4, Record at 32, the allowance is intended only for a federal court order, as a state court would have no jurisdiction over NDIS. It is clear from item 1(B) on the Checklist that the "court order" referred to in the Operational Procedures is a federal court order. Record at 38.

-7-

Moreover, the Operational Procedures contemplate a federal court order with respect to a Manual
Keyboard Search of DNA data which complies with quality control requirements. *See* Operational
Procedures, 4.0, Record at 31 (before performing a search pursuant to 4.4, the NDIS Custodian shall
ensure the request complies with the DNA Identification Act, the Privacy Act, and other applicable
legislation/regulation).

### Quality Assurance and Accreditation

(18) That a forensic laboratory meet or exceed Quality Assurance Standards and be accredited
are requirements contained in the DNA Identification Act for participation in NDIS. *See* 42 U.S.C. §§
14131, 14132. These are separate and distinct requirements.

(19) The Quality Assurance Standards were created and recommended to the FBI Director by
the DNA Advisory Board pursuant to 42 U.S.C. § 14131. These standards are widely known and are
used by the scientific, law enforcement, and research communities. They are not limited in application
to NDIS. On the contrary, they have a broader application; however, 42 U.S.C. § 14132 requires that
data included in NDIS be generated by laboratories which are compliant with the standards. Because
compliance with these widely-referenced standards is required by federal law, they are made publicly
available, among other places, on the FBI's public website at:

http://www.fbi.gov/hq/lab/codis/forensic.htm.

(20) One of the ways that a laboratory's compliance with these Quality Assurance Standards
may be demonstrated is through accreditation. Accreditation is not performed by the FBI Laboratory;
however, information concerning accreditation is discussed in the CODIS section of the FBI's website.
Accreditation for crime laboratories is performed by two private, independent accrediting bodies in the

-8-

United States: ASCLD/LAB (American Society of Crime Laboratory Directors/Laboratory Accreditation Board)-International or Forensic Quality Services-International. Each of these organizations has, respectively, a search function and list of accredited laboratories on its website. The FBI Laboratory is accredited under the ASCLD/LAB-International program. To achieve accreditation, a crime laboratory must demonstrate that its technical operations and overall management system meet the requirements of the accreditation program. When it is necessary for the FBI's CODIS Unit to determine whether or not a laboratory is accredited (*i.e.*, when the CODIS Unit is not already familiar with the laboratory), CODIS Unit personnel consult one of these two public sources.

(21) Just as the Quality Assurance Standards are not limited in application to NDIS purposes, neither is accreditation limited to NDIS. Accreditation is granted according to disciplines. For example, the FBI Laboratory is accredited in the disciplines of controlled substances, toxicology, biology (which includes DNA), trace evidence, firearms/toolmarks, latent prints, questioned documents, and crime scene. Accreditation requires regular monitoring and auditing by the accrediting body. The auditor reviews the laboratory's quality system, policies, procedures and records to ensure that the accreditation program requirements are met. Accreditation provides an independent, impartial, and objective review of the laboratory's operations. While accreditation is not limited in application to NDIS, 42 U.S.C. § 14132 requires that any data included in NDIS be generated by accredited laboratories.

(22) The fundamental importance of maintaining compliance with the Quality Assurance Standards and accreditation requirements mandated by the DNA Identification Act for DNA data cannot be overstated. It is adherence to the quality and privacy protections imposed by federal law

that NDIS attributes its success as an invaluable tool to law enforcement. Adherence to quality standards was one of Congress' goals in enacting the DNA Identification Act. The House of Representatives Judiciary Committee noted, in particular, the conclusion of a privacy expert that "both government and private laboratories doing DNA analysis for forensic use should meet designated quality standards and be subject to periodic inspections." H.R. REP. NO. 103-45, at 7 (citation omitted). Adherence to the requirements and intent of the Act, with its emphasis on quality standards, is one of the primary reasons that NDIS has operated successfully for a decade, from 1998 to 2008. During this period there have been no reported incidents of incorrect identification as a result of the operation of NDIS. Furthermore, this careful adherence to statutory and systemic safeguards of NDIS has been noted with approval by the federal judiciary in upholding constitutional challenges to various amendments to the DNA Identification Act. Thus, while there have been proposals from various sources to reduce the minimum quality requirements in order to permit quicker or more voluminous analyses, the FBI Laboratory, as guardian of NDIS, has consistently and successfully resisted such proposals in order to carry out Congress's mandate and maintain the integrity of NDIS.

(23) Adherence to the statutory safeguards of NDIS is necessary to maintain the credibility of this law enforcement tool for those agencies participating in the CODIS program and for the public. If the FBI Laboratory were to disregard statutory and procedural safeguards -- express and non-discretionary mandates designed to ensure the integrity of NDIS -- there would be no assurance regarding the accuracy of the information provided by NDIS, whether to identify criminals or exonerate the innocent.

-10-

**Manual Keyboard Search Requested In This Case**

(24) The Operational Procedures, Checklist, and Official Facsimile Form set forth express

requirements. The FBI Laboratory followed and applied these requirements to the request submitted

by Plaintiff in this case consistent with the manner in which these requirements are applied in all cases.

(25) Plaintiff alleges, in paragraph 15 of his Complaint, that:

> Personnel at the Illinois State Police Research and Development Laboratory have
> reviewed Dr. Blake's work for quality control purposes and have confirmed that the
> DNA profile he obtained excludes Defendant as a source for the Sperm. Furthermore,
> they developed a 'low level' 'corroborating' genetic profile of the Sperm donor based
> on nearly identical biological material from the crime scene that had remained in the
> possession of the Illinois State Police Lab. That 'low level' profile also excluded
> Defendant as a possible source for the Sperm.

This alleged review by the Illinois State laboratory is not an acceptable substitute for meeting federal

requirements to ensure quality control of DNA data accepted for Manual Keyboard Searches. The

relevant inquiry is whether or not the DNA profile submitted by Plaintiff's counsel meets all federal

requirements, including, but not limited to, whether it was developed under procedures which were

consistent with the Quality Assurance Standards and by an accredited laboratory. Plaintiff does not

state that Dr. Blake's laboratory meets the Quality Assurance and accreditation requirements, nor does

he state that the Illinois State laboratory confirmed that Dr. Blake complies with the Quality Assurance

Standards or is accredited. To the contrary, Plaintiff acknowledges in paragraph 24(c) of his

Complaint, that Dr. Blake "has declined to apply for accreditation based on principle and cost."

(26) Plaintiff also alleges, in paragraph 15 of his Complaint, that "[b]oth the State's Attorney of

Lake County and Defendant's lawyers believe it is in the interests of justice that FBI personnel search

the genetic profile described in Exhibit A against CODIS." The apparent agreement of counsel is not a

-11-

substitute for federal requirements to ensure quality control of DNA data accepted for Manual

Keyboard Searches, and such agreement has no bearing upon the decision which was made by the FBI

in this case. It is federal law and NDIS procedures which control the FBI's administration of NDIS

and the CODIS program.

(27) The Manual Keyboard Search which was requested in this case did not comply with the

federal DNA Identification Act and NDIS procedural requirements for the following reasons:

(a) it was not submitted by a CODIS State (SDIS) Administrator;

(b) it was not generated by or on behalf of a state or local criminal justice agency, nor was it

accompanied by a federal court order requiring the search to be conducted;

(c) it was not generated by an accredited laboratory;

(d) it was not generated by a laboratory which has demonstrated that it meets or exceeds the

Quality Assurance Standards.

(28) A DNA profile developed without such compliance with the Quality Assurance Standards

and accreditation requirements presents an increased likelihood of containing errors, including but are

not limited to, contamination from another sample that could result in an incorrect identification by

CODIS of a potentially matching profile, or development of an inaccurate profile which could result in a

failure to identify a potential match to a perpetrator. An error at just one locus can result in the failure

to identify a potential perpetrator.

(29) Because the request to conduct a Manual Keyboard search in this case was deficient in

the above-stated ways, the FBI Laboratory, NDIS Custodian, denied the request to search the profile

in NDIS.

-12-

(30) Plaintiff alleges in paragraph five (5) of his Complaint that, "The DNA profile keyboard search that Plaintiff seeks this court to order the FBI to conduct may provide evidence crucial to Plaintiff's defense in his forthcoming trial, and information as to the person who raped and killed Holly Staker." It should be noted that even if the NDIS Custodian were to honor the request made by Plaintiff in this case, any Manual Keyboard Search conducted of the submitted DNA profile would likely fail to produce the result Plaintiff desires and would not "provide evidence crucial to Plaintiff's defense," for the following reasons:

(a) NDIS does not contain names, case-related information, or other personally-identifying information about the persons from whom DNA samples are collected. *See* 61 Fed. Reg. 37495 (July 18, 1996) ("FBI Privacy Act Systems"). Only "operational identifiers" such as Specimen Numbers, Criminal Justice Agency Identifiers, and DNA Personal identifiers are linked with the corresponding DNA data in NDIS. *Id.* NDIS does not release operational identifiers of potential matches to any party other than the holder of the identifiers – the agency which submitted the DNA profile for inclusion into NDIS.

(b) NDIS searches only return potential candidate matches. In the event of a potential match, NDIS' role is to notify the submitting law enforcement agencies of the potential match, referring to the respective operational identifiers; it is then the responsibility of those agencies to go through confirmation procedures to determine whether there is a match in fact. Each state has its own confirmation procedures.

(c) Thus, in the event that the DNA data which was the subject of Plaintiff's request were searched against NDIS and a potential match identified, the result would be in the form of the type of

operational identifiers referenced above, and NDIS would notify the contributing agency of any

potentially matching profile. Plaintiff would have to seek information concerning the potentially matching

profile from that agency. Any response by the agency would be governed by relevant state law and a

matter over which the FBI would have no control.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge and belief.

Executed this 12 day of January, 2009.


Douglas R. Hares, PhD
NDIS Custodian
CODIS Unit
FBI Laboratory
Quantico, Virginia